UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JEFFREY A. BRAMAN,                    )
                                      )
                                      )
            Plaintiff,                )        Case No. 1:10-cv-1259
                                      )
v.                                    )        Honorable Joseph G. Scoville
                                      )
COMMISSIONER OF                       )
SOCIAL SECURITY,                      )
                                      )        **OPINION**
            Defendant.                )
_____)

This is a social security action brought under 42 U.S.C. §§ 405(g), 1383(c)(3) seeking

review of a final decision of the Commissioner of Social Security denying plaintiff's claims for

disability insurance benefits (DIB) and supplemental security income (SSI) benefits.  On July 13,

2006, plaintiff filed his applications for benefits alleging a May 1, 2000 onset of disability.[1]  (A.R.

219-26).  Plaintiff's disability insured status expired on June 30, 2009.  Thus, it was plaintiff's

burden to submit evidence demonstrating that he was disabled on or before June 30, 2009.  *See Moon*

*v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

Plaintiff's claims for DIB and SSI benefits were denied on initial review.  (A.R. 126-

34).  On January 30, 2009, plaintiff  received a hearing before an administrative law judge (ALJ),

_____

[1]SSI benefits are not awarded retroactively for months prior to the application for benefits.
20 C.F.R. § 416.335;  *see Kelley v. Commissioner*, 566 F.3d 347, 349 n.5 (3d Cir. 2009); *see also*
*Newsom v. Social Security Admin.*, 100 F. App'x 502, 504 (6th Cir. 2004).  The earliest month in
which SSI benefits are payable is the month after the application for SSI benefits is filed.  Thus,
August 2006 is plaintiff's earliest possible entitlement to SSI benefits.

at which he was represented by counsel. (A.R. 69-106). On March 26, 2009, the ALJ issued a decision finding that plaintiff was not disabled. (A.R. 112-20). On September 12, 2009, the Appeals Council vacated the ALJ's decision and remanded the matter for further administrative proceedings. (A.R. 123-25). On February 11, 2010, plaintiff received a hearing before an administrative law judge (ALJ), at which he was represented by counsel. (A.R. 36-68). On March 19, 2010, the ALJ issued a decision finding that plaintiff was not disabled. (A.R. 18-31). The Appeals Council denied review on October 20, 2010 (A.R. 1-3), and the ALJ's decision became the Commissioner's final decision.

Plaintiff filed a timely complaint seeking judicial review of the Commissioner's decision. Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, the parties voluntarily consented to have a United States magistrate judge conduct all further proceedings in this case, including entry of final judgment. (docket # 9). Plaintiff asks the court to overturn the Commissioner's decision on the following grounds:

1. The ALJ "failed to sufficiently explain his adverse credibility findings;"

2. The ALJ's RFC finding is not supported by substantial evidence because it did not include "needed breaks for pain, fatigue, and to check blood sugars;" and

3. "The ALJ failed to give sufficient weight to the opinions of the plaintiff's medical providers, Edward Lewis, M.D. and B. R. Reames, PA-C."

(Plf. Brief at iii, docket # 10). Upon review, the Commissioner's decision will be affirmed.

## Standard of Review

When reviewing the grant or denial of social security benefits, this court is to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner correctly applied the law. *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124,

125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007). The scope of the court's review is limited. *Buxton*, 246 F.3d at 772. The court does not review the evidence *de novo*, resolve conflicts in evidence, or make credibility determinations. *See Ulman v. Commissioner*, No. 11-2304, __ F.3d __, 2012 WL 3871353, at * 4 (6th Cir. Sept. 7, 2012); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference." *Buxton*, 246 F.3d at 772-73. "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently." *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996) ("[E]ven if the district court -- had it been in the position of the ALJ -- would have decided the matter differently than the ALJ did, and even if substantial evidence also would have supported a finding other than the one the ALJ made, the district court erred in reversing the ALJ."). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the

conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see*

*Kyle v. Commissioner*, 609 F.3d 847, 854 (6th Cir. 2010).

## Discussion

The ALJ found that plaintiff met the disability insured status requirements of the

Social Security Act on May 1, 2000, his alleged onset of disability, and continued to meet the

requirements through June 30, 2009, but not thereafter. (A.R. 20). The work plaintiff performed

after his alleged onset of disability did not rise to the level of substantial gainful activity precluding

an award of benefits at step 2 of the sequential analysis.[2] (A.R. 20). The ALJ found that plaintiff

had the following severe impairments: "degenerative disc disease, depression, osteoarthritis of the

right shoulder, left shoulder impingement, diabetes, bipolar disorder, and borderline personality

disorder." (A.R. 21). Plaintiff did not have an impairment or combination of impairments which

met or equaled the requirements of the listing of impairments. (A.R. 21). The ALJ found that

plaintiff retained the following residual functional capacity (RFC):

> After careful consideration of the entire record, I find that the claimant has the residual
> functional capacity to perform a narrowed range of sedentary work as defined in 20 CFR

---

[2]"Administrative law judges employ a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Social Security Act." *Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004). Under the sequential analysis, "The claimant must first show that []he is not engaged in substantial gainful activity. Next, the claimant must demonstrate that []he has a 'severe impairment.' A finding of 'disabled' will be made at the third step if the claimant can then demonstrate that h[is] impairment meets the durational requirement and 'meets or equals a listed impairment.' If the impairment does not meet or equal a listed impairment, the fourth step requires the claimant to prove that []he is incapable of performing work that []he has done in the past. Finally, if the claimant's impairment is so severe as to preclude the performance of past work, then other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed. The burden shifts to the Commissioner at this fifth step to establish the claimant's ability to do other work." *White v. Commissioner*, 572 F.3d 272, 282 (6th Cir. 2009).

404.1567(a) and 416.967(a).  He could occasionally lift 10 pounds, sit for approximately 6 hours in an 8-hour workday with normal breaks, stand or walk for approximately 2 hours in an 8-hour workday with normal breaks; would require a sit/stand option alternatively at will; could do no pushing/pulling with the upper extremities; could not operate foot controls with the lower extremities; should never climb ramps or stairs; should never climb ladders, ropes or scaffolds; could engage in occasional balancing and stooping; and should never kneel, crouch, and crawl.  He should avoid concentrated exposure to extreme cold, heat, wetness, humidity, and excessive vibration.  He should avoid all exposure to workplace hazards such as unprotected machinery and unprotected heights due to effects of pain medication.  Work would be limited to simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements; involving only simple work-related decisions; and with few, if any, workplace changes.

(A.R. 22-23).  The ALJ determined that plaintiff's subjective complaints were not fully credible. (A.R. 23-29).  He found that plaintiff was not capable of performing his past relevant work.  (A.R. 29).  Plaintiff was 27-years-old as of his alleged onset of disability, 36-years-old when his disability insured status expired, and 37-years-old as of the date of the ALJ's decision.  Thus, at all times relevant to his claims for DIB and SSI benefits, plaintiff was classified as a younger individual. (A.R. 29).  Plaintiff has at least a high school education and is able to communicate in English. (A.R. 29).  The ALJ found that the transferability of jobs skills was not material to a disability determination.  (A.R. 29).  The ALJ then turned to the testimony of a vocational expert (VE).  In response to a hypothetical question regarding a person of plaintiff's age, and with his RFC, education, and work experience, the VE testified that there were approximately 9,200 jobs in Michigan's Lower Peninsula that the hypothetical person would be capable of performing.  (A.R. 65-66).  The ALJ found that this constituted a significant number of jobs.  Using Rule 201.28 of the

Medical-Vocational Guidelines as a framework, the ALJ held that plaintiff was not disabled.[3]  (A.R. 29-31).

## 1.

Plaintiff argues that the ALJ "failed to sufficiently explain his adverse credibility findings" and that the ALJ's factual finding regarding his RFC should have included additional restrictions for plaintiff's need to take unscheduled breaks.  (Plf. Brief at 14-16; Reply Brief at 2-4).

A.    Credibility

This case turns on the ALJ's credibility determination regarding plaintiff's subjective complaints.  Credibility determinations concerning a claimant's subjective complaints are peculiarly within the province of the ALJ.  *See Gooch v. Secretary of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987).  It is the ALJ's function to determine credibility issues.  *See Siterlet v. Secretary of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).  The court does not make its own credibility determinations.  *See Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997).  The court's "review of a decision of the Commissioner of Social Security, made through an administrative law judge, is extremely circumscribed . . . ."  *Kuhn v. Commissioner*, 124 F. App'x

---

[3]Since 1996, the Social Security Act, as amended, has precluded awards of SSI and DIB benefits based upon alcoholism and drug addiction.  *See* 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); 20 C.F.R. §§ 404.1535, 416.935; *see also Bartley v. Barnhart*, 117 F. App'x 993, 998 (6th Cir. 2004); *Hopkins v. Commissioner*, 96 F. App'x 393, 395 (6th Cir. 2004).  The claimant bears the burden of demonstrating that drug and alcohol addiction was not a factor contributing to his disability.  *See Cage v. Commissioner*, No. 09-4530-cv, __ F.3d __, 2012 WL 3538264, at * 4-6 (2d Cir. Aug. 17, 2012); *Parra v. Astrue*, 481 F.3d 742, 748 (9th Cir. 2007); *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999); *see also Zarlengo v. Barnhart*, 96 F. App'x 987, 989-90 (6th Cir. 2004).  Because plaintiff was found not to be disabled, the ALJ was not required to decide the issue of whether substance abuse was material to a finding of disability.

943, 945 (6th Cir. 2005). The Commissioner's determination regarding the credibility of a claimant's subjective complaints is reviewed under the "substantial evidence" standard. This is a "highly deferential standard of review." *Ulman v. Commissioner*, No. 11-2304, __ F.3d __, 2012 WL 3871353, at * 5 (6th Cir. Sept. 7, 2012). "Claimants challenging the ALJ's credibility determination face an uphill battle." *Daniels v. Commissioner*, 152 F. App'x 485, 488 (6th Cir. 2005). "Upon review, [the court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying." *Jones*, 336 F.3d at 476. "The ALJ's findings as to a claimant's credibility are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge [his] subjective complaints." *Buxton v. Halter*, 246 F.3d at 773; *accord White v. Commissioner*, 572 F.3d 272, 287 (6th Cir. 2009); *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993).

The ALJ found that plaintiff's testimony regarding his functional limitations was not fully credible:

> The claimant at the initial hearing testified that, when he was working as a carpenter, he would occasionally change positions to relieve his pain. At the hearing held in February 2010, the claimant reported that he had been hospitalized 36 times and had 15 surgeries which are not supported by the evidence of record. The claimant testified that he would have to lie down once an hour for 15 to 30 minutes each time during the day. In fact, there are mentions throughout the file that the claimant was able to bend and almost touch his toes (Exhibits 3F p. 9 and 11F p. 7)[A.R. 359, 418], could do pushups (p. 8)[A.R. 419], was walking without difficulty, and was not displaying any pain behaviors (Exhibits 15F and 16F)[A.R. 477-87]. The claimant continued to return to work that is medium exertional level and has mentions of him carrying wood and hanging drywall (Exhibits 14F and 11F)[A.R. 413-49, 465-76]. These are not the actions of someone who would be limited to not even sedentary work on a consistent basis as argued by the claimant's representative.

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's testimony regarding the intensity, persistence and limiting effects of these

> symptoms are not credible to the extent they are inconsistent with the above residual capacity assessment.
>
> While I do not doubt that the claimant experiences some difficulty, his statements concerning his impairments and their impact on his ability to work are not entirely credible in light of the claimant's own description of his activities and lifestyle, the degree of medical treatment required, the reports of treating and examining practitioners, the medical history, the findings made on examination, and the claimant's assertions regarding his ability to work.

(A.R. 28-29).  It was appropriate for the ALJ to take plaintiff's daily activities into account in making his credibility determination.  *See Cruse v. Commissioner*, 502 F.3d 532, 542 (6th Cir. 2007); *Blacha v. Secretary of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Heston v. Commissioner*, 245 F.3d at 534.  Carrying wood and hanging drywall are activities far in excess of what would be anticipated from an individual who claims that he is incapable of performing a limited range of sedentary work.  The ALJ's credibility finding is supported by more than substantial evidence and the ALJ gave a more than adequate explanation why he found that plaintiff's testimony was not fully credible.  *See Rogers v. Commissioner*, 486 F.3d 234, 247-49 (6th Cir. 2007).

        B.      <u>Residual Functional Capacity (RFC)</u>

        Plaintiff argues that the ALJ's factual finding regarding his RFC is not supported by substantial evidence.  RFC is an administrative finding of fact reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d)(2), (3), 416.927(d)(2), (3).  RFC is the most, not the least, a claimant can do despite his impairments.  20 C.F.R. §§ 404.1545(a), 416.945(a); *Griffeth v. Commissioner*, 217 F. App'x 425, 429 (6th Cir. 2007).

The ALJ found that plaintiff retained the RFC for a limited range of sedentary work with a sit/stand option, no pushing or pulling with the upper extremities, no use of foot controls with the lower extremities, no climbing of ramps, stairs, ladders, ropes or scaffolds, occasional balancing and stooping, and no kneeling, crouching, and crawling.  Plaintiff should avoid concentrated exposure to extreme cold, heat, wetness, humidity, and excessive vibration, and avoid all exposure to workplace hazards such as unprotected machinery and unprotected heights due to effects of pain medication.  Further, plaintiff was limited to simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements, involving only simple work-related decisions, and with few, if any, workplace changes.  (A.R. 22-23).  The court finds that the ALJ's factual finding regarding plaintiff's RFC is supported by more than substantial evidence.

There are huge gaps in the evidence plaintiff filed in support of his claims for DIB and SSI benefits.  Although plaintiff claims a May 1, 2000 onset of disability, the earliest medical record he submitted is dated almost three years after the alleged onset date.[4]  (A.R. 429).

On April 6, 2004, Mark Adams, M.D., reported that plaintiff's EMG showed no active nerve damage.  Plaintiff had normal strength and was able to do a pushup without difficulty.  (A.R. 419).

In June 2004, Neurosurgeon E. Malcolm Field, M.D., performed a consultative evaluation.  Dr. Field found that plaintiff had no disturbance of "gait, taste, smell, speech, swallowing, reading, writing, memory functions, [or] orientation." (A.R. 418).  He had stiffness and tightness in his back, but was "able to go down to about touch his toes." (A.R. 418).  Plaintiff was

---

[4]Plaintiff was well aware of this deficiency in the evidence he presented.  (A.R. 73-75).

performing the construction work of hanging drywall.  (A.R. 418).  His July 2004 MRI showed the post-surgical changes at L4-5, but there was no evidence of disc herniation or stenosis.  (A.R. 428).

Plaintiff testified that he had 15 surgeries (A.R. 48), but the only surgical records found in this administrative record stem from his June 2007 and April 2009 surgeries performed by Dr. Schell.  (A.R. 442-45, 609-10).[5]  Plaintiff did not submit any medical records for 2005.  He worked as a carpenter from October 2005 to March 2006: work which involved lifting and carrying "stacks of wood, building materials, equipment, tools, trusses [] up to 100 ft.[,] at times all day."  (A.R. 286-88).  Plaintiff began treating with Physician's Assistant B. R. Reames in May 2006.  (A.R. 51, 352, 454).  Progress notes for June 1, 2006, indicate that plaintiff was taking insulin for his diabetes.  He stated that he experienced depression and anxiety.  Mr. Reames gave him a prescription for Ativan.  (A.R. 353).  On July 6, 2006, Physician's Assistant T. Phan stated that plaintiff could perform work "with no restrictions."  (A.R. 367).

On July 13, 2006, plaintiff filed his applications for DIB and SSI benefits.  His July 28, 2006 MRI showed post-operative changes with a magnetic artifact at L4-L5, and "minimal" broad based bulging of the L5-S1 disc without significant neural effacement.  (A.R. 349, 368).  In August and September 2006, plaintiff sought and obtained prescriptions for narcotic medications from Dr. Lewis, a "family friend" (A.R. 51) and general surgeon.[6]  (A.R. 360-61).  Plaintiff saw Dr.

---

[5]There are allusions to plaintiff's 1999 back surgery performed by Dr. Flood.  (A.R. 359, 416, 428).

[6]When plaintiff was 16-years-old, Dr. Lewis performed his appendectomy, but that was eleven years before plaintiff's alleged onset of disability.  (A.R. 51). There are no medical records from any surgical procedure that Dr. Lewis performed during the decade at issue, or in the decade preceding it.

Lewis on three occasions: August 8, 29, and September 26, 2006.[7]  On August 8, 2006, plaintiff did not appear to be in any acute distress.  He had a full range of motion in his extremities and his strength, sensation and reflexes were intact bilaterally.  Neurologically, plaintiff was oriented in all three spheres.  His cranial nerves, motor and sensory systems were intact.  He was alert and oriented. (A.R. 361).  Dr. Lewis expressed significant concern about plaintiff's long-term use of narcotics, but nonetheless gave him a month's supply of Duragesic patches. (A.R. 362).  Three weeks later, on August 29, 2006, plaintiff returned to Lewis's office.  Lewis counseled plaintiff regarding the possibility of addiction, but did refill plaintiff's prescription for Duragesic patches. (A.R. 365).  Dr. Lewis recommended that plaintiff keep his medication in a very secure place because it was "apt to be stolen by drug seekers."  (A.R. 365).

On September 19, 2006, Dr. Field conducted another neurological consultation.  He found no evidence of sensory deficits.  Plaintiff's fusion was solid.  He had no muscle atrophy and no significant paravertebral muscle tightness.  (A.R. 359, 416).  On September 20, 2006, plaintiff sought additional Dilaudid at Medics P.C. in Edmore, Michigan.  He stated that he ran out of the medication a week and a half earlier.  (A.R. 356).  Plaintiff's last visit with Dr. Lewis occurred on September 26, 2006.  Plaintiff requested and obtained more medication.  Dr. Lewis refilled the Duragesic prescription, with the limitation that plaintiff use it "once every three days."  (A.R. 364).  A September 28, 2006 MRI revealed no spinal canal stenosis or significant neural foraminal compromise.  A "mild" effacement of the thecal sac was observed "from either a disc bulge or possibly that of postoperative scarring."  (A.R. 350, 426).

---

[7]Dr. Lewis's letter to Mr. Reames on August 8, 2006, described plaintiff as Reames's patient. (A.R. 362).

On November 2, 2006, Justin Northeim, D.O., examined plaintiff. (A.R. 372-76). Plaintiff was not in any acute distress. He had a full range of motion in all extremities. (A.R. 374). His motor strength was 5/5. (A.R. 376).

On November 6, 2006, plaintiff appeared at the Montcalm Center for Behavioral Health seeking outpatient services to help him deal with anxiety and depression. He was living with his girlfriend. He reported that he had a good relationship with his ex-wife, and that they had joint custody of their 14-year-old daughter. Plaintiff related that he had been working in Mecosta County until March 1, 2006. He stated that he stopped working after rupturing a disc while on the job. When asked about his history of legal involvement, plaintiff reported that he "had three convictions of DUI's" which "did result in some jail time." He reported that he had two domestic violence charges brought against him, but declined to provide further information.[8] (A.R. 389; see A.R. 533-34). Plaintiff gave a history of extensive abuse of alcohol, cocaine, heroin, acid, methamphetamine, and other substances:

> Jeff reports that he first used alcohol at the age of 10. Reports the date last used was six months ago which was the last time he entered rehab. Also reports that he smoked marijuana starting at the age of 15. Again, his last use was approximately six months ago. Also reports a history of using heroin, morphine, Dilantin, Vicodin. Reports that first stage of use was 25. Reports that the date last used was approximately three weeks ago when he was in Carson City. Also reports a history of using acid. Reports that this was at age 17 and that he only engaged in this "a couple of times." Also reports that he engaged in the use of crystal meth, cocaine, coke and crack at age 21. Reports that the last date he used was five to six months ago. Reports that he used to use a[n] eight ball every day. Denies any use at this time. Also reports a history of using Xanax, Klonopin, Ativan, and Valium. Reports that he first began using these at the age of 25. Reports that his [last] use was three months ago. Reports that he was using every day. Reports that the first time he began smoking cigarettes

---

[8]Plaintiff is generally not eligible to receive social security benefits for any months he was confined in a jail or prison. See 42 U.S.C. §§ 402(x)(1)(A), 1382(e)(1)(A); 20 C.F.R. §§ 404.468, 416.1325.

was at the age of 10.  Reports he drinks a couple of cups of coffee and a couple of pops a day.  [It w]as discussed with Jeff how this could be impacting his anxiety.

(A.R. 390).

On November 22, 2006, plaintiff's nerve conduction study returned normal results. There was no evidence of significant peripheral neuropathy or myopathy.  There was evidence of "mild" L5 radiculopathy on the left side.  (A.R. 434).  On January 4, 2007, a CT scan of the lumbar spine yielded no evidence of focal disc extrusion.  (A.R. 423-24).  Plaintiff's lumbar myelogram revealed the postoperative changes of the L5-S1 fusion with satisfactory alignment.  A "very minimal ventral defect" at the L4-L5 level appeared to be causing "mild" narrowing of the thecal sac. (A.R. 425).

On June 18, 2007, Gerald Schell, M.D., performed a decompressive lumbar laminectomy at L4-5 and L4, L5, S1 fusion with removal of the L5-S1 disc.  (A.R. 445-46).  There were no post-operative complications.  (A.R. 413, 442-43).

On October 31, 2007, plaintiff received a psychiatric evaluation by David Lyon, D.O., a board certified psychiatrist at the Montcalm Center for Behavioral Health.  (A.R. 541-43).  Plaintiff reported that he was living with his long-term girlfriend and that she was providing his financial support.  He stated that he began using marijuana at age 12 and cocaine at age 16.  He stated that he used marijuana on an almost-daily basis.  He stated that he was an alcoholic and drank heavily in the past.  He reported that legal complications from his drinking "included three DUIs as well as being arrested for driving on a suspended license five times as well as two domestic assaults."  (A.R. 541). He conceded that he was "addicted to cocaine in the past as well."  (A.R. 541).  His cocaine abuse reached "up to an eight ball a day."  (A.R. 542).  "He's tried heroin, methamphetamine, LSD, acid and other illicit substances.  He admits that he was addicted to Norco which was being prescribed

for him.  He was also buying some on the street.  He also admits at one point he was addicted to

benzodiazepines where he would use Xanax excessively.  He admitted to me one time he took over

90 Xanax over a weekend," combined with alcohol consumption.  (A.R. 542).  Dr. Lyon noted: "In

all he's had three detoxes as well as three addiction residential treatments.  His last detox was 2

weeks ago."  (A.R. 541).  Plaintiff stated that a typical day involved watching television, playing

Xbox games, and helping out around the house.  (A.R. 541).  Dr. Lyon offered the following

diagnosis:

| | |
|---|---|
| Axis I: | 296.32  Major Depressive Disorder, moderate, recurrent, in partial remission (one would have to R/O PTSD depression secondary to substance abuse) |
| | 300.02 Generalized Anxiety Disorder |
| | 305.1   Nicotine Dependence |
| | 303.90 Alcohol Dependence in early remission |
| | 304.00 Opioid Dependence in early remission |
| | 304.20 Cocaine Dependence, in reported sustained remission |
| | R/O Benzodiazepine Dependence |
| Axis II: | R/O Personality Disorder |
| Axis III: | The patient has diabetes mellitus as well as degenerative disc disease with chronic back pain.  He's had two surgeries on his back.  He's had an appendectomy.  He had surgery on his left hand because of a trigger finger.  Current review of symptoms includes back pain, currently mild. |
| Axis IV: | Moderate stressors include legal difficulties, unemployed with limited finances, substance abuse history with limited family support although he does feel his girlfriend is supportive. |
| Axis V: | GAF: 60 to 65. |

(A.R. 543).

On November 27, 2007, plaintiff returned to Psychiatrist Lyon and admitted that he

had obtained Valium from his primary care physician.  He stated that he "took a couple."  When Dr.

Lyon contacted the pharmacy, the pharmacist "reported on 11/9 he got 60 Vicodin and then he had

-14-

that filled again yesterday for another 60.  He also had Tramadol on 11/17 number 120." (A.R. 482).

Plaintiff reported that he was doing well and denied any suicidal ideation.  He admitted that he

continued to smoke marijuana and drink alcohol.  Dr. Lyon expressed skepticism regarding the truth

of plaintiff's story about how he had obtained the marijuana.  (A.R. 482).  Dr. Lyon summarized the

results of the mental status examination as follows:

> The patient is a 34 year old white male who is casually dressed with a blue hat with M block
> on it, yellow sweatshirt and jeans.  He's chewing tobacco.  He makes good eye contact.  Was
> pleasant and cooperative.  His speech was clear and coherent without any evidence of
> pressure.  His mood is reported to be "good."  His affect was broad and appropriate.
> Thoughts were clear and organized [and] goal directed.  No suicidal or homicidal ideation,
> no psychotic or manic symptoms.  He seems to have adequate insight and judgment except
> with regards to his drug addiction.  His attention and memory are grossly intact and he was
> alert and oriented times three out of three.

(A.R. 482).  Dr. Lyon recommended that plaintiff abstain from drugs and alcohol.  He strongly

encouraged "AA or some type of inpatient addiction treatment." (A.R. 483).  Plaintiff's response

was that he "d[id] not want to do these at this time." (A.R. 483).

On January 8, 2008, plaintiff told Dr. Lyon that he did get drunk on Christmas Eve.

He reported frustration stemming from his ex-wife's refusal to let him see their daughter because his

substance use made him too irrational.  Plaintiff reported that he "didn't use" when his daughter was

around.  (A.R. 479).  Dr. Lyon recommended that plaintiff get professional help in "coming off

Valium and the opiates."  Plaintiff stated that he would try to do it on his own.  (A.R. 480).

On March 4, 2008, Dr. Lyon noted that plaintiff's grooming and hygiene were good.

He walked without difficulty and did not appear to be in any pain.  His affect was appropriate.  His

thoughts were clear and organized.  His attention and memory were grossly intact and he was

oriented in all three spheres.  Plaintiff seemed "to have adequate insight and judgment except with

regards to his drug addiction.  He admitted . . . that he did drink alcohol on a couple of occasions and

did rationalize this." (A.R. 486). Plaintiff continued to use Vicodin and Valium. This concerned Dr. Lyon, and when it was suggested that plaintiff get off the Valium and opiates, plaintiff's response was that he still needed them and did not want to get off them. (A.R. 486-87). A month later, plaintiff reported that he had stopped taking Valium and Vicodin and felt better. He continued to drink alcohol. (A.R. 484-85).

On June 26, 2008, plaintiff reported to Dr. Lyon that he "just got out of detox." (A.R. 549). Plaintiff was taking up to 20 Vicodin a day. When he ran out of the prescribed Vicodin, he would buy more on the street. He was also using up his Valium. He would get "60 a month and use those up in 3-4 days," then buy more from illicit sources. (A.R. 549). Dr. Lyon strongly recommended that plaintiff get into some type of residential treatment facility. Plaintiff seemed to have a negative attitude and struggled with bitterness and anger, which Dr. Lyon identified as a trigger for relapse. Dr. Lyon made a phone call to Physician's Assistant Reames and explained to him that plaintiff just got out of detox, and he was concerned that Mr. Reames might prescribe opiates and benzodiazepines. (A.R. 550, 553). When Dr. Lyon asked plaintiff for a release to talk to his pain specialist, plaintiff's response was that he did not know the name of his physician. Dr. Lyon suspected that plaintiff "may try to get pain medications out of him." (A.R. 550).

On October 8, 2008, plaintiff was a "no show" for his appointment with Dr. Lyon. Lyon was concerned that plaintiff was "possibly using prescription drugs again." (A.R. 544). On October 8, 2008, plaintiff called on the telephone and revoked all of his consents allowing Dr. Lyon to talk to his family physician. Psychiatrist Lyon stated: "This will not be acceptable for me to be able to treat him without being able to talk with his other prescribing physicians." (A.R. 545).

-16-

On November 3, 2008, plaintiff was discharged as a patient of the Montcalm Center for Behavioral Health.  The discharge summary provided an overview of the care plaintiff had received during his two years as a patient.  Plaintiff made significant progress in the anxiety and depression symptoms he reported.  He had been "in detox twice for his drug use during this time and ha[d] significantly reduced his usage of these medications."  (A.R. 488).  Plaintiff's diagnosis at the time of discharge was as follows:

| | |
|---|---|
| Axis I: | 296.32 Major Depressive Disorder, moderate, recurrent, stable R/O depression secondary to substance abuse, R/O PTSD |
| | 300.02 Generalized Anxiety Disorder |
| | 305.1  Nicotine Dependence |
| | 303.90 Alcohol Dependence, in early partial remission |
| | 304.00 Opioid Dependence |
| | 304.20 Cocaine Dependence, in reported sustained remission, R/O Benzodiazepine Dependence |
| Axis II: | 301.83 Borderline Personality Disorder. |

(A.R. 488).  Plaintiff was advised to follow-up with North Kent Guidance for further substance abuse counseling.  (A.R. 489).

On November 7, 2008, Janmeet Sahota, M.D., examined plaintiff.  (A.R. 467-68).  Plaintiff had no AC joint tenderness.  "His strength appeared to be equal bilaterally and was 5/5 with elevation in the scapular plane."  (A.R. 467).  Dr. Sahota administered an injection in plaintiff's left shoulder which "almost completely resolved" plaintiff's complaints of left shoulder pain.  (A.R. 467).  Dr. Sahota recommended an arthrogram on plaintiff's right shoulder to rule out a rotator cuff tear.  (A.R. 468).  Plaintiff's arthrogram returned normal results.  (A.R. 470-71).

Plaintiff performed construction work for a remodeling company from October 1, 2008, through January 2009.  (A.R. 332-33).  On November 11, 2008, Mr. Reames gave a statement

to plaintiff's attorney.  (A.R. 451-63).  Among other things, Mr. Reames offered his opinion that plaintiff was not capable of performing sedentary work.  (A.R. 461-62).

On December 1, 2008, plaintiff reported to Dr. Sahota that his left shoulder felt "much, much better" after the injection.  (A.R. 465).  Plaintiff requested and received an injection in his right shoulder.  Afterwards, he reported that "his shoulder pain was essentially completely resolved."  (A.R. 465).

On April 16, 2009, Dr. Schell noted that plaintiff was a 35-year-old male who has had previous laminectomy and lateral fusion done almost two years earlier.  Postoperative imaging studies demonstrated "a pretty good fusion."  Dr. Schell observed significant disc space collapse and associated anterior foraminal stenosis, and he felt that plaintiff would benefit from anterior interbody fixation.  (A.R. 612).  On April 16, 2009, Dr. Schell performed a "360 lumbar fusion with anterior interbody fusion and diskectomy at L3-L4 and posterior facet instrument fusion at L3-L4."  (A.R. 609).  On May 18, 2009, plaintiff was "healing quite nicely.  He ha[d] good strength."  (A.R. 601).  On August 21, 2009, Dr. Schell noted that plaintiff had recently admitted himself to the hospital for detox based on overdose of narcotics.  Dr. Schell found that plaintiff was showing signs of neurologic improvement and could continue with conservative treatment.  (A.R. 600).  Plaintiff's disability insured status expired on June 30, 2009.

On December 7, 2009, plaintiff appeared at St. Mary's Health Care stating that he was experiencing suicidal thoughts after ending his relationship with his girlfriend of six years.  Plaintiff "denied going through withdrawal, although he ha[d] been abusing Suboxone with [] Valium." (A.R. 595).  Plaintiff reported that he "d[id] not like the Valium."  (A.R. 595).  Hyder H. Makki, D.O., noted plaintiff's history of Vicodin, Suboxone, and Valium abuse.  (A.R. 595).  Plaintiff

-18-

related that he had been working with Psychiatrist Lyon, but "did not like him so he quit."  (A.R. 596).  Plaintiff had a "12th grade regular education" and average intelligence.  (A.R. 596).  He did not experience hallucinations and was not paranoid.  (A.R. 598).  Plaintiff received Seroquel, Ativan, and Neurontin prescriptions.  The discharge plan was to have plaintiff follow-up with his psychiatrist and therapist.  (A.R. 599).

        The record summarized above provides more than substantial evidence supporting the ALJ's factual finding that plaintiff retained the RFC for a limited range of sedentary work.  It is noteworthy that plaintiff's treating surgeon, Dr. Schell, and his treating psychiatrist, Dr. Lyon, never expressed opinions that plaintiff was disabled or otherwise incapable of performing a limited range of sedentary work.  The court finds no basis for disturbing the Commissioner's decision.

## 2.

        Plaintiff argues that the ALJ failed to give sufficient weight to the statements Dr. Lewis and Mr. Reames gave to his attorney.  The issue of whether the claimant is disabled within the meaning of the Social Security Act is reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); *see Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004).  A treating physician's opinion that a patient is disabled is not entitled to any special significance.  *See* 20 C.F.R. §§ 404.1527(d)(1), (3), 416.927(d)(1), (3); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007); *Sims v. Commissioner*, 406 F. App'x 977, 980 n.1 (6th Cir. 2011) ("[T]he determination of disability [is] the prerogative of the Commissioner, not the treating physician.").  Likewise, "no special significance" is attached to treating physician opinions regarding the credibility of the plaintiff's subjective complaints, RFC, or whether the plaintiff's impairments meet or equal the requirements of a listed impairment because they are administrative issues reserved to the

-19-

Commissioner.  20 C.F.R. §§ 404.1527(d)(2), (3), 416.927(d)(2), (3); *see Allen v. Commissioner*, 561 F.3d 646, 652 (6th Cir. 2009).

        Generally, the medical opinions of treating physicians are given substantial, if not controlling deference.  *See Johnson v. Commissioner*, 652 F.3d 646, 651 (6th Cir. 2011).  "[T]he opinion of a treating physician does not receive controlling weight merely by virtue of the fact that it is from a treating physician.  Rather, it is accorded controlling weight where it is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is not 'inconsistent . . . with the other substantial evidence in the case record.'"  *Massey v. Commissioner*, 409 F. App'x 917, 921 (6th Cir. 2011) (quoting *Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009)).  A treating physician's opinion is not entitled to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation."  *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001).  An opinion that is based on the claimant's reporting of his symptoms is not entitled to controlling weight.  *See Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see also Francis v. Commissioner*, 414 F. App'x 802, 804 (6th Cir. 2011) (A physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all.").

        Even when a treating source's medical opinion is not given controlling weight because it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the record, the opinion should not necessarily be completely rejected; the weight to be given to the opinion is determined by a set of

factors, including treatment relationship, supportability, consistency, specialization, and other factors. *See Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions*, SSR 96-2p (reprinted at 1996 WL 374188 (SSA July 2, 1996)); 20 C.F.R. §§ 404.1527(c), 416.927(c); *Martin v. Commissioner*, 170 F. App'x 369, 372 (6th Cir. 2006).

The Sixth Circuit has held that claimants are "entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Commissioner*, 482 F.3d 873, 875-76 (6th Cir. 2007); *see Cole v. Astrue*, 652 F.3d 653, 659-61 (6th Cir. 2011); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). "[T]he procedural requirement exists, in part, for claimants to understand why the administrative bureaucracy deems them not disabled when physicians are telling them that they are." *Smith*, 482 F.3d at 876; *see Rabbers v. Commissioner*, 582 F.3d 647, 657 (6th Cir. 2009).

A.    Dr. Lewis

Plaintiff argues that Dr. Lewis was a treating physician and that the ALJ should have given controlling weight to his "Medical Provider's Assessment of Patient's Ability to do Work-Related Activities."  (Plf. Brief at 6-9; Reply Brief at 1-4).  Social security regulations define a "treating source" as a physician or other acceptable medical source who has had an "ongoing treatment relationship" with the claimant:

> *Treating source* means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).  . . .  We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim

for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

20 C.F.R. §§ 404.1502, 416.902; *see Coldiron v. Commissioner*, 391 F. App'x 435, 442 (6th Cir. 2010).

Plaintiff provided five pages of medical records from Dr. Lewis for the ten-year span from his alleged onset of disability through the date of the ALJ's decision. (A.R. 360-64). Further, these few pages are limited to the two months immediately after plaintiff filed his applications for DIB and SSI benefits. Dr Lewis is a general surgeon and a family friend. He did not perform any surgical procedure on plaintiff during the period at issue, or remotely close to it. The ALJ's finding that Dr. Lewis was not a treating physician is supported by more than substantial evidence. *See Kornecky v. Commissioner*, 167 F. App'x 496, 506-07 (6th Cir. 2006). Because Dr. Lewis was not a treating physician, the ALJ was "not under any special obligation to defer to [his] opinion[s] or to explain why he elected not to defer to [them]." *Karger v. Commissioner*, 414 F. App'x 739, 744 (6th Cir. 2011).

On May 1, 2009, almost three years after plaintiff's last visit, Dr. Lewis completed a "Medical Provider's Assessment of Patient's Ability to do Work-Related Activities." (A.R. 588-91). The ALJ carefully considered this statement and provided a detailed explanation why he found that the extreme restrictions proffered by Dr. Lewis were not persuasive:

> Dr. Edward Lewis (the family friend) completed a medical assessment on May 1, 2009, in which he limited the claimant to lifting no more than 5 pounds occasionally and indicated he could sit for a total of 15 minutes, stand for a total of 30 minutes, and walk for a total of 10 minutes in an 8-hour workday with normal breaks. He indicated that the claimant needed a back brace to ambulate and was first limited in 1996. He also indicated that the claimant could occasionally reach above shoulder level, push and pull, crawl; would be totally restricted from stooping, squatting, kneeling, climbing and crouching; could not operate foot controls; and should avoid all heights, dangerous moving machinery, and vibration; should

-22-

avoid concentrated exposure to temperature extremes, humidity, pulmonary irritants, noise, and motor vehicle use (Exhibit 22F)[A.R. 588-91].

\* \* \*

I give little weight to the assessment of Dr. Lewis, who is a family friend and who the claimant stated he had seen in May 2006. His assessment in Exhibit 22F is inconsistent with the physical examination performed [i]n June 2008 (Exhibit 19F)[A.R. 575-76]. The extreme limitations on standing and walking noted by Dr. Lewis would preclude the activities of daily living performed by the claimant such as doing his own laundry, shopping for groceries, and surfing the Internet.

(A.R. 27-28). Even assuming that plaintiff had presented evidence sufficient to establish an ongoing treatment relationship with Dr. Lewis, the above-quoted paragraphs satisfy the requirements of the treating physician rule. *See Cole v. Astrue*, 652 F.3d at 659-61; *Smith v. Commissioner*, 482 F.3d at 875-76.

B.     Physician's Assistant Reames

Plaintiff argues that the ALJ should have given more weight to the statement Physician's Assistant Reames gave to his attorney. (Plf. Brief at 9-13; Reply Brief at 1-4). A physician's assistant is not an "acceptable medical source." *See* 20 C.F.R. §§ 404.1513(a), (d), 416.913(a), (d). There is no treating physician's assistant rule, and the opinion of a physician's assistant is not entitled to any particular weight. *See Geiner v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008). Only "acceptable medical sources" can: (1) provide evidence establishing the existence of a medically determinable impairment; (2) provide a medical opinion; and (3) be considered a treating source whose medical opinion could be entitled to controlling weight under the treating physician rule. *See Titles II and XVI: Considering Opinions and Other Evidence from Sources Who are not 'Acceptable Medical Sources' in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies*, SSR 06-3p (reprinted at 2006 WL 2329939,

-23-

at * 2 (SSA Aug. 9, 2006)). The opinions of a physician's assistant fall within the category of information provided by "other sources." *Id.* at * 2; *see* 20 C.F.R. §§ 404.1513(d), 416.913(d). The social security regulations require that information from other sources be "considered." 2006 WL 2329939, at * 1, 4 (citing 20 C.F.R. §§ 404.1512, 416.912). This is not a demanding standard. It was easily met here.

The ALJ considered all Mr. Reams's opinions. He found that some were persuasive, and that others were unduly restrictive:

> Mr. Ream[e]s, a physician's assistant, stated in a deposition taken on November 17, 2008 that he had treated the claimant since May 2006 for insulin-dependent diabetes mellitus and diabetic neuropathy for which he was being treated with Insulin, severe chronic back pain for which he was being prescribed Lortab, and major depressive disorder for which he was being prescribed Seroquel and Cymbalta. He opined that the claimant was unable to lift more than a gallon of milk in each hand occasionally, to stand all day, and to do prolonged sitting; would need to change positions or move around; and could do no squatting, climbing or twisting. He stated that, if the claimant could not change positions frequently, he would need to lie down in a recliner to relieve the pressure off his spine during the day. He did not think the claimant could perform sedentary work on a sustained basis due to his back pain, need for frequent resting, and checking his blood sugar levels (Exhibit 13F)[A.R. 451-64].

> * * *

> The finding of disability for the purposes of the Social Security Administration is left to the Commissioner. While the opinions from treating sources are given greater weight, Mr. Ream[e]s is not a physician, but a physician's assistant; therefore, the weight of his opinion is that of a[n] other source and not a treating physician. I give some weight to the weight restrictions and the need to have a sit/stand option; however, the other limitations are inconsistent with the specialists' reports and examination, particularly the June 2008 normal physical examination.

(A.R. 27-28). The ALJ is responsible for weighing medical opinions, not the court. *See Buxton*, 246 F.3d at 772-75; *see also Price v. Commissioner*, 342 F. App'x 172, 177-78 (6th Cir. 2009).

-24-

## **Conclusion**

The court finds no error in the record requiring reversal.  Plaintiff's medical history did not support the extreme restrictions that he was claiming, and the ALJ had more than sufficient grounds to question the credibility of both plaintiff and Physician's Assistant Reames.  The ALJ gave the medical evidence and opinions the weight that they deserved.  For the reasons set forth herein, the Commissioner's decision will be affirmed.


Dated:  October 17, 2012                    /s/  Joseph G. Scoville_____
                                                          United States Magistrate Judge

-25-